F I L E D
Clerk
District Court

AUG 06 2019

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

IMPERIAL PACIFIC INTERNATIONAL
(CNMI) LLC,
        Plaintiff,

vs.

COMMONWEALTH CASINO
COMMISSION,
        Defendant.

_____

GRAND MARIANAS (CNMI), LLC, and
IMPERIAL PACIFIC PROPERTIES, LLC,
        Plaintiffs-in-Intervention,

vs.

COMMONWEALTH CASINO
COMMISSION,

        Defendant.

Case No.: 19-cv-00014

**DECISION AND ORDER**
**DENYING PETITION FOR**
**PRELIMINARY INJUNCTION**

## I.     Introduction

This case requires the Court to reconcile laws that protect two important public interests that

are in tension: the general public's interest in an open government that transacts business in the light

1

of day, and the interest of individuals and companies in preventing the unnecessary disclosure of their private, confidential information that the government comes to possess.

Plaintiff Imperial Pacific International (CNMI), LLC ("IPI") holds an exclusive gaming license and operates the sole casino on Saipan in the Commonwealth of the Northern Mariana Islands ("CNMI" or "Commonwealth"). Defendant Commonwealth Casino Commission ("CCC") is the agency established to regulate casino gaming through the exclusive casino license in the CNMI. Commonwealth gaming statutes and regulations require CCC to make available for public inspection financial statements that IPI is required to submit to it periodically. IPI and its two wholly owned subsidiaries, Grand Marianas (CNMI), LLC and Imperial Pacific Properties, LLC (collectively referred to as "Plaintiff-Intervenors"), have asked the Court to prevent the disclosure of unredacted financial statements because, in their view, those statements contain confidential information protected from disclosure by provisions in the CNMI tax code and the Open Government Act, and by guarantees of privacy in the U.S. and Commonwealth Constitutions. In order to obtain such protection, IPI filed a petition for a preliminary injunction prohibiting CCC from releasing the unredacted financial statements while this case is pending.

A preliminary injunction can be granted only if the party requesting it can establish: (1) it is likely to win the case on the merits, (2) it will suffer irreparable harm if the court does not grant the injunction, (3) the balance of equities between the parties tips in its favor, and (4) an injunction is in the public interest. Having reviewed the briefs and evidence presented and considered the arguments of counsel, the Court finds that IPI and Plaintiff-Intervenors have not demonstrated that a preliminary

injunction is warranted under this test. Therefore, for the reasons set forth below, the Court DENIES the Petition for a Preliminary Injunction.

## II.    Background

CCC is authorized by statute to collect information from applicants and licensees, some of which it must maintain as confidential. 4 CMC §§ 2314(i)(1)–(2). Section 2314 expressly designates seven categories of casino licensee information as not confidential and mandates that such information "shall be made available for public inspection." 4 CMC §§ 2314(i)(4)(A)–(G).

This dispute arises from an Open Government Act ("OGA") request filed with CCC by Edwin K. Propst, Precinct One Representative in the CNMI House of Representatives, on June 13, 2019. Representative Propst asked for the following information: (1) 2017 and 2018 audit reports for IPI/Best Sunshine[1] prepared by Ernst & Young; (2) all Business Gross Revenue Tax ("BGRT") payments made by IPI/Best Sunshine to date, with amounts and dates; and (3) all corporate income taxes paid by IPI/Best Sunshine. (ECF No. 1-1 at 11.[2]) CCC notified IPI of the request and asked IPI to respond with any objections to the release of the information. (*Id.* at 12.) IPI replied with objections to the disclosure of its tax information. (*Id.* at 13–15.) After some conversations between the parties and their counsel, Assistant Attorney General Michael Ernest told IPI that CCC intended to release the information on June 24, 2019 over its objections. (*Id.* at 18.)

---

[1] IPI does business under the name "Best Sunshine." (See IPI's Am. Memo. in Support of Proposed Redactions, ECF No. 1-1 at 308) ("Imperial Pacific International (CNMI), LLC dba Best Sunshine International.")

[2] All page number references for ECF No. 1-1 are to the "Exhibit 1 - #" on the bottom righthand corner of the page and not to the ECF filing page number.

That same day, on June 24, 2019, IPI filed a Petition for Temporary Restraining Order ("TRO") and Preliminary Injunction, as well as a Petition for Injunctive Relief and Complaint for Declaratory Relief in the Commonwealth Superior Court, requesting that CCC and its executive director be enjoined from releasing IPI's tax information. (*Id.* at 1–5.) All parties stipulated to the intervention of Plaintiff-Intervenors but limited the scope of their argument to the disclosure of their own information only. (*Id.* at 297–298.) The Superior Court initially granted the TRO on June 24 and extended it to July 25, 2019. (*Id.* at 79–80; 743–44.) During that month, the parties extensively briefed the issues and the Superior Court held several days of hearings on the petition for the preliminary injunction. (*See generally* Super. Ct. Docket, ECF No. 1-3.)

On July 23, 2019, Defendants CCC and its Executive Director filed a notice of removal to this Court. (ECF No. 1.) IPI moved for an extension of the TRO which was set to expire in two days. (ECF No. 5.) For good cause, this Court extended the TRO to Friday, August 2, 2019 at 11:59 p.m. (Order, ECF No. 17.) The Court set the case for a hearing on the preliminary injunction. The Court also issued an order inviting supplemental briefs on the questions of *Pullman* abstention and supplemental jurisdiction over the CNMI law claims. (ECF No. 18.) All parties submitted briefs. (See ECF Nos. 21, 22, 23.)

The parties agree that the scope of a preliminary injunction should be limited to the release of unredacted Consolidated Financial Statements from 2015, 2015/2016, and 2016/2017. IPI and

Plaintiff-Intervenors argue protection should apply to the 2017/18 Statement as well.[3] They presented evidence and arguments on the Petition for a Preliminary Injunction on July 30, 2019 and August 1, 2019. After closing arguments, the Court extended the TRO to Thursday, August 8, 2019 at 11:59 p.m. to allow for the issuance of this decision.

### III.    Preliminary Injunction

a.    <u>Legal Standard</u>

A "preliminary injunction is not a preliminary adjudication on the merits, but a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001). "[It] is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). Courts apply a four-factor test to determine whether to grant a preliminary injunction. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The Ninth Circuit applies the test with a sliding scale, whereby "a stronger showing of one element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). This approach is commonly called the "serious questions test": "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can

---

[3] The 2017/2018 financial statement has already been released under unclear circumstances. (See IPI's Am. Memo. at 8, ECF No. 1-1 at 308; Opp'n at 20, ECF No. 1-1 at 451.)

support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

"Serious questions" are questions that "cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions ... by altering the status quo." *Gilder v. PGA Tour, Inc.,* 936 F.2d 417, 422 (9th Cir. 1991) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc)). Serious questions "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)).

### b.  Likelihood of Success on the Merits

IPI makes several legal arguments as to why some of the information in its financial statements should be redacted before they are released for public inspection. First, it asserts that the CNMI tax code, 4 CMC §§ 18161–64, provides for privacy rights in tax returns and tax return information, and that the OGA, 1 CMC § 9901 *et seq.*, recognizes business entity privacy rights in records and exempts tax information from public inspection. (*Id.* at 94, 98.) IPI asserts that those protective provisions trump the public inspection provision in 4 CMC § 2314, which CCC is relying upon to release the financial statements in full.  It further asserts that there is an open question regarding a CNMI constitutional right to privacy for corporate taxpayers that could raise equal protection concerns under both the U.S. and Commonwealth Constitutions. (*Id.* at 97.) Later, in its amended memorandum of law in support of its proposed redactions, IPI raised the argument that its information is protected by a federally recognized constitutional corporate right of privacy. (*Id.* at 303–4.)

In their memorandum in support of IPI's petition for a TRO and preliminary injunction,[4] Plaintiff-Intervenors assert that their confidential information cannot be released pursuant to 4 CMC § 2314 because they are not casino licensees, but subsidiaries of the licensee who are not engaged in gaming. (*Id.* at 426.) They further argue that the disclosure of their information is governed by the OGA, which provides for the release of some but not all public records and protects their confidential tax information. (*Id.* at 427.)

### i.   CNMI Statutory Claims

IPI and Plaintiff-Intervenors argue that the disclosure of their information is prohibited by the CNMI tax code and the OGA. CCC contends that the disclosure is required under the Gaming Act at 4 CMC § 2314. To determine how these three different statutory provisions should be construed and which one should govern this dispute, the Court looks to CNMI law for principles of statutory construction.

### 1.   Principles of Statutory Construction

When construing a state statute, a district court looks to the state for rules of statutory construction. *Hunt v. Check Recovery Sys., Inc.*, 478 F. Supp. 2d 1157, 1162 (N.D. Cal. 2007). CNMI courts apply several basic principles of statutory construction. "The most basic canon of statutory construction is that the [statutory] language must be given its plain meaning, where the meaning is

---

[4] At the August 1 hearing, Plaintiff-Intervenors' counsel confirmed that they joined in IPI's Petition for a Preliminary Injunction and are not requesting a preliminary injunction on the basis of their Complaint-in-Intervention. As such, the Court does not address the likelihood of success on the merits of Plaintiff-Intervenors' Complaint in this decision.

clear and unambiguous." *Saipan Achugao Resort Members' Ass'n v. Yoon*, 2011 MP 12 ¶ 23 (internal quotation omitted). Statutes must also be read "with an aim to effect the plain meaning of [its] object." *Marianas Eye Inst. v. Moses*, 2011 MP 1 ¶ 11. Statutes should be read *in pari materia*, so that "the meaning and application of a specific statute or portion of a statute is determined by looking to statutes which relate to the same person or thing and which have a purpose similar to that of the statute being construed." *Id.* ¶ 11 n.6. A more specific statute controls over a more general one. *Limon v. Camacho*, 1996 MP 18 ¶ 30. Two statutory provisions "are irreconcilable only where 'there is a positive repugnancy between them or . . . they cannot mutually coexist.'" *Faisao v. Tenorio,* 4 N. Mar. I. 260, 265 (1995) (quoting *Radzanower v. Touche Ross* & Co., 426 U.S. 148, 155 (1976)). It is the duty of the court to give effect to statutory provisions that are capable of coexistence. *Id.* at 265 n.14. With these principles in mind, the Court turns to the language of the three statutes at issue here.

### 2. Statutory Provisions

Title 4, Chapter 3, Article 2 ("Casino Controls") of the Commonwealth Code "provides for and controls casino gambling in the Commonwealth." 4 CMC § 2311. Section 2314 defines the powers and duties of CCC.  It includes the following provision regarding confidentiality of information:

> Except as otherwise provided in this chapter, all information required by the Commission to be furnished pursuant to this chapter or the regulations promulgated hereunder, or which may be otherwise be obtained, relative to the internal controls or to the earnings or revenue of any applicant or licensee shall be considered to be confidential and shall not be revealed in whole or in part except in the course of the necessary administration of this chapter, or upon the lawful order of a court of competent jurisdiction, or, with the approval of the Attorney General, to a duly authorized law enforcement agency.

4 CMC § 2314(i)(1). In 2015, the Legislature passed Public Law 19-24, which amended section 2314 by exempting certain information from the confidentiality provision. There are seven categories of "information to be reported periodically to the Commission by a casino licensee [that] shall not be considered confidential and shall be made available for public inspection[.]" 4 CMC § 2314(i)(4). The subsection in dispute here is § 2314(i)(4)(F): "All quarterly and annual financial statements presenting historical data which are submitted to the Commission, including all annual financial statements which have been audited by an independent certified public accountant licensed to practice in the CNMI."

The CNMI tax code provides that "[r]eturns and return information shall be confidential, and except as authorized by this Article no officer or employee of the Commonwealth shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this Division." 4 CMC § 18161. Returns are "any tax or information return, declaration of estimated tax, certificate of entry, or claim for refund . . . which is filed with the Secretary." 4 CMC § 18162(a). Return information is defined as:

> A taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, over-assessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this Division for any tax, penalty, interest, fine, forfeiture, or other imposition, or Offense . . .

4 CMC § 18162(b)(1). The statute defines disclosure as "the making known to any person, in any manner whatever, a return or return information." 4 CMC § 18162(h).

The OGA provides that "all public records shall be available for inspection by any person during established office hours unless public inspection of such records is in violation of any Commonwealth or federal law." 1 CMC § 9917(a). It defines public records as "any record which a public agency is required by law to keep or which it is necessary to keep in discharge of duties imposed by law. Such public records . . . shall not include records which invade the right of privacy of an individual or business entity." 1 CMC § 9902(f). The OGA further exempts thirteen categories of records from public inspection, including "[i]nformation required of any taxpayer in connection with the assessment or collection of any tax." 1 CMC § 9918(a)(3).

### 3.  IPI's Claims

IPI argues that section 2314 is a general statutory provision, whereas the CNMI tax code sections are specific provisions that control the confidentiality and disclosure of tax return information and OGA sections are specific provisions that control the public inspection of taxpayer information. (*Id.* at 97.) CCC, on the other hand, asserts that section 2314 is the more specific statute. (ECF No. 1-1 at 119.) The Court agrees with CCC. Section 2314 sets forth the regulation of the casino licensee; IPI is the *exclusive* casino licensee. In *Limon v. Camacho*, the CNMI Supreme Court held that in a dispute about nonresident workers, the Nonresident Worker Act, which applied specifically to nonresident workers, governed over the more general Wage and Hour Act, which applied to all employees in the CNMI. 1996 MP ¶ 30. Similarly, here Section 2314(i)(4) applies specifically to IPI, whereas the tax code provisions apply to all taxpayers and the OGA provisions apply to public records requests in general. Additionally, the principle of reading statutory provisions *in pari materia* applies when statutes relate to the same person or thing and have a similar purpose. Here, although all three

provisions relate to tax and financial information, they have very different purposes. The purpose of section 2314 is to strip the casino licensees' audited annual financial statements of confidentiality and guarantee that they be available for public inspection. Conversely, the sections from the tax code and OGA are aimed at protecting tax information from wrongful disclosure and public inspection. For these reasons, the Court finds that IPI is unlikely to succeed in its argument that the CNMI tax code and OGA provisions control.

The Court now turns to IPI's claims regarding the application of section 2314. IPI asserts that section 2314 is ambiguous in that it does not explicitly authorize the release of tax returns and return information. (Compl. at 7, ECF No. 1-1 at 95.) Furthermore, it recognizes that redaction of documents might be appropriate in some circumstances by allowing CCC to charge fees for "costs incurred in the review, redaction, and copying, by the Commission of documents subject to public inspection." 4 CMC § 2314(j). IPI argues that section 2314 should be interpreted to allow for the disclosure of financial statements with the confidential tax return information redacted. CCC counters that the statute is clear and unambiguous; it mandates that all audited annual financial statements are not confidential and are subject to public inspection. Moreover, on October 26, 2017, CCC issued Order No. 2017-004, which recognizes the statutory exemptions from confidentiality for information provided by the casino licensee and establishes reporting practices, including a provision that "the information provided pursuant to this Order shall be, and is, the information accessible to the public."

IPI submitted in evidence the testimony that its expert witness, Certified Public Accountant David Burger, gave in the Superior Court on July 9 and 10, 2019 about taxes and audited financial statements. Financial statements show a business's income, expenses, assets, liability and equity. (ECF

No. 27 at 17.)  An audited financial statement is one that is reviewed by a licensed accountant who verifies that the information is materially correct. (*Id.* at 17–18.) Burger testified that the information in a company's financial statement includes information required by the accounting principles generally accepted in the United States (GAAP)[5] and other information the company chooses to include. (*Id.* at 35.) If available, an audited financial statement will be used to generate the company's income tax return. (*Id.* at 21.) He further testified that tax return information in the financial statements includes any numbers that will be provided on the tax return, including inventories, assets, liabilities, revenues, expenses, and accounts payable. (*Id.* at 27–28.) Moreover, he stated that financial statements are generally confidential unless the company is in a regulated industry that requires it to submit them to a regulatory authority. (*Id.* at 11.) Some companies are required under GAAP to issue consolidated financial statements, which incorporate the information of majority owned subsidiary companies. (*Id.* at 18.) IPI's financial statements are consolidated and contain information about their wholly owned subsidiaries, including the two Plaintiff-Intervenors. (*See* ECF No. 1-1 at 319–423.)

IPI is not likely to succeed on the merits of the argument that section 2314 is ambiguous. The statute clearly states that all annual audited financial statements shall be made available for public inspection. As IPI's own tax and accounting expert testified, the contents of these statements are determined first by GAAP and then by IPI's own choices about what additional information to include. There is significant overlap between the contents of an audited financial statement and what IPI's

---

[5] "GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time. GAAP changes and, even at any one point, is often indeterminate." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (internal quotation and citation omitted).

expert testified is confidential tax return information: inventories, assets, liabilities, revenues, and expenses. The purpose of a financial statement is to present the financial condition of a company or group of companies. (ECF No. 27 at 38.) Burger testified that a complete audited financial statement must include three separate statements: (1) a statement of financial condition, which is a balance sheet of assets, liabilities and equity; (2) a statement of operations, which details earnings and income as well as expenses paid; and (3) a statement of cash flows, which states how much cash the business generated from operations, investments, and financing. (*Id.* at 20.) In addition to these three statements, an audited financial statement must contain footnotes that disclose the accounting policies and provide a breakdown of some of financial information, such as property and equipment. (*Id.*) The redactions that IPI proposes for its 2015/16, 2016/17 and 2017/18 financial statements completely black out the statements of financial condition, statements of operations, and statements of cash flow, leaving only the footnotes and some supplemental information to be disclosed. (*See* ECF No. 1-1 at 335–423.) IPI's proposed redactions for its 2015 financial statement are not as extreme, but under its interpretation of the law, they certainly could be. (*See id.* at 319–34.) It would defeat the objects of section 2314(i)(4) — public inspection and non-confidentiality of the annual financial statements — to read the statute to permit the redaction of all tax return information from IPI's financial statements because that would result in the total redaction of the three discrete financial statements that must be included in an audited financial statement and leave only the footnotes for public inspection.

### 4.   Plaintiff-Intervenor Claims

Plaintiff-Intervenors bring a separate argument against the application of section 2314 to their information. They assert that the public disclosure provisions of section 2314 apply to casino licensees

and any information CCC collects about other companies is confidential under the general confidentiality provision at section 2314(i)(1). (ECF No. 1-1 at 428–29.) Plaintiff-Intervenors only seek to redact the supplemental information that was not required under GAAP and as such did not need to be included in IPI's financial statements. (*Id.* at 426.) Additionally, Plaintiff-Intervenors argue that their information is protected under the OGA. (*Id.* at 428.)

Section 2314 addresses the confidentiality of information received from the casino licensee and applicants, but not subsidiary companies of either. GAAP standards require consolidated financial statements where a parent company has majority owned subsidiaries. Therefore, CCC will necessarily receive information about these subsidiaries when IPI submits its financial statements. Notably, Plaintiff-Intervenors are not seeking to redact any of their information that must be included in IPI's consolidated financial statement pursuant to GAAP; they only ask to redact the supplemental information that could have been excluded at the time of filing. (Burger Decl. ¶ 6, ECF No. 1-1 at 720.) At this stage of the proceedings, the Court does not have enough information about Plaintiff-Intervenors and their role in possibly assisting IPI with its premises investments to definitively conclude that their financial information is not subject to section 2314 disclosure. See 4 CMC § 2314(i)(4)(D)–(E). Therefore, the Court agrees that there is enough ambiguity in the statute regarding its application to parties other than the casino licensee to raise a serious question on the merits.

Additionally, Plaintiff-Intervenors argue that the protections of the OGA should apply to their information. Whereas by its language, section 2314 specifically applies to IPI as the casino licensee, it does not specifically address confidentiality for non-gaming subsidiaries like Plaintiff-Intervenors. This also raises a serious question as to which statute should apply to Plaintiff-Intervenors'

information in this case.  Therefore, the Court finds that Plaintiff-Intervenors has established serious questions going to the merits of its claims that cannot be resolved at this time.

### ii.  CNMI Constitutional Claim

The CNMI Constitution expressly recognizes an individual right to privacy: "The right of individual privacy shall not be infringed except upon a showing of compelling cause." N. Mar. I. Const. art. I § 10. IPI argues that "it is an open question under CNMI law whether the constitutional right of privacy applies to corporations." (ECF No. 1-1 at 305). IPI asserts that the language of section 10 recognizes a broad zone of privacy. (*Id.*) It points to the fact that the CNMI Supreme Court recognizes an individual taxpayers' constitutional right to privacy in tax returns. (*Id.*) (citing *Sablan v. Inos*, 2 N. Mar. I. 388 (1991), *overruled on other grounds by United States ex rel. Richards v. Deleon Guerrero*, Misc. No. 92-00001, 1992 WL 321010 (D. N. Mar. I. 1992), *aff'd*, 4 F.3d 749 (9th Cir. 1993)). IPI argues that if that right belongs to individuals, equal protection mandates that all similarly situated persons (individual and corporate taxpayers) should be treated the same absent a rational basis for disparate treatment. (*Id.*)

CCC argues that the CNMI Constitution recognizes only an individual right of privacy, not a corporate or legal-entity right to privacy. (*Id.* at 441.) In support, it cites to the Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands ("Analysis"). (*Id.*) The Analysis is a memorandum approved by the Constitutional Convention to explain and summarize the intent

behind the approval of the different sections. Analysis at 1.[6] It "is extremely persuasive authority when one is called upon to discern the intent of the framers when the language of the Constitution presents an ambiguity." *Rayphand v. Tenorio*, 2003 MP 12 ¶ 74. For article 1, section 10, the Analysis explains that "[t]he right guaranteed by this section applies only to individual persons. . . . *It does not apply to corporations*, associations or other legal entities *even though they are deemed to be persons for other purposes*." *Id.* at 28. (emphasis added).

In the CNMI, the basic principles of statutory construction discussed above also apply to questions of constitutional construction. *Camacho v. N. Marianas Ret. Fund*, 1 N. Mar. I. 362, 368 (1990). "A basic principle of constitutional construction is that language must be given its plain meaning" *Torres v. Manibusan*, 2018 MP 4 ¶ 13 (internal quotation and citation omitted). If the plain language is ambiguous, the court must "attempt to ascertain and give effect to the intent of the drafters of the provision." *Id.* (internal quotation and citation omitted). A plain reading of the language of the CNMI Constitution and drafting history from the Analysis indicate that article I, section 10 only protects the privacy rights of individuals and should not be read to endow corporations with constitutionally protected privacy rights. None of the three cases to which IPI cites in support of its equal protection argument treats individuals and corporations as similarly situated persons; instead they apply equal protection to different classes of natural persons. *See Yang v. Am. Intern. Knitters*

---

[6] Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands is available on the website of the Northern Marianas Humanities Council: http://nmhcdigitalarchive.org/ConConVer.1.0/1st%20Con-Con%20Directory%2012_04_06/1976%2012%2006%20Constitution%20Analysis.pdf (last visited Aug. 1, 2019).

*Corp.*, 789 F. Supp. 1074, 1079 (D. N. Mar. I. 1992) (holding that CNMI law denying nonimmigrant workers the right to sue for wage and hour violations violated the equal protection clause); *Elliot-Park v. Manglona*, Civil No. 07-0021, 2008 WL 11389558 at *3–4 (D. N. Mar. I. 2008) (individual stated an equal protection claim based on race and/or national origin, as well as a class-of-one claim against a police officer); *Limon v. Camacho*, 1996 MP 18 ¶ 31 (rejecting equal protection claim based on disparate treatment of resident and nonresident workers). Moreover, IPI's argument that there is no rational basis for treating corporate and individual taxpayers differently is unlikely to succeed on the merits. As CCC argued, there are many plausible reasons for subjecting the casino licensee to greater regulation than an individual or even another type of business, including its monopoly status and general concerns about financial crimes and gambling. (ECF No. 1-1 at 444.)  Therefore, the Court finds that IPI is unlikely to be successful on the merits of this claim.

### iii.   Federal Constitutional Claim

IPI argues that corporations have a right to privacy guaranteed in the U.S. Constitution, one that has been specifically recognized by the Supreme Court. (*Id.* at 303.) It bases this argument in a review of the history of Supreme Court jurisprudence treating corporations as persons. *See, e.g., Grosjean v. American Press Co.*, 297 U.S. 233, 244 (1936) (a corporation is a person within the meaning of the equal protection and due process clauses); *Dow Chemical v. United States*, 476 U.S. 227, 235–36 (1986) (corporations have certain Fourth Amendment rights); *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 319 (2010) (corporations have First Amendment free speech rights).

The law is far less clear than IPI suggests. *See generally* Elizabeth Pollman, *A Corporate Right to Privacy*, 99 Minn. L. Rev. 27 (2014); Eric W. Orts & Amy Sepinwall, *Privacy and Organizational*

*Persons*, 99 Minn. L. Rev. 2275 (2015). The Supreme Court has recognized that corporations have some constitutional rights, but also that some "purely personal" constitutional guarantees are unavailable to corporations. *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n.14 (1978) ("Certain 'purely personal' guarantees, such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the 'historic function' of the particular guarantee has been limited to the protection of individuals.") "Whether or not a particular guarantee is 'purely personal' or is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision." *Id.* In *Federal Communications Commission v. AT&T*, the Supreme Court held that corporations are not protected by the "personal privacy" exemption in the Freedom of Information Act, but expressly stated that the "case does not call upon us to pass on the scope of a corporation's 'privacy' interests as a matter of constitutional or common law." 562 U.S. 397, 407 (2011). The Ninth Circuit has held that a particular privacy interest is not available to corporations, but it has not gone as far as to hold that corporations have no constitutional guarantee of privacy. *See Fleck and Assoc., Inc. v. Phoenix*, 471 F.3d 1100, 1105 (9th Cir. 2006) (privacy interest guaranteed by the Supreme Court in *Lawrence v. Texas*, i.e., the right to make choices about intimate relationships free from governmental sanction, is unavailable to a corporate entity).

Although the jurisprudence governing federal constitutional rights of corporations is not settled, the Court finds little likelihood that IPI would succeed on this claim. The constitutional corporate right to privacy it rests on has not been recognized by the Ninth Circuit or the Supreme Court. Moreover, the facts here are not favorable for an expansion of the scope of corporate rights

protected by the federal Constitution. Gambling is an area of state interest that exists in the CNMI solely as a creature of legislation.[7] Gambling is a highly regulated industry, and the CNMI legislature was clear and unambiguous that the licensee would not have an expectation of privacy in the seven categories of information exempted in section 2314(i)(4)(A)–(G).

### c.   Likelihood of Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (rejecting the "possibility of harm" standard as too lenient). "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "Evidence of loss of control over business reputation and damage to goodwill could constitute irreparable harm." *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). However, the element of harm must be grounded in evidence, rather than conclusory statements about harm that the petitioner might suffer. *Id.* Moreover, a "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (citing *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)).

//

---

[7] "Gambling is prohibited in the Northern Mariana Islands except as provided by Commonwealth law or established through initiative in the Commonwealth or in any senatorial district." N. Mar. I. Const. art. XXI.

To demonstrate harm, IPI relies on a newspaper article from the *Marianas Variety*[8] and the testimony of Shen Yan, the President of Global Capital Markets for IPI Holdings ("IPIH"), IPI's parent company, who is responsible for investor relations and fundraising. IPI and Plaintiff-Intervenors point to the article as an example of negative press coverage related to the release of IPI's 2017/2018 financial statement. Yan testified that negative media reports have an adverse impact on his ability to fundraise. In his experience, investors will do news searches on IPI and review other public information when deciding to invest. The harm Yan identified when information or misinformation is released is: (1) the company may be unprepared for mass inquiries related to media releases; (2) if the information is untrue or facts are twisted, the company is unable to address investors directly to place the information in context; and (3) the company lacks the privacy protection of non-disclosure agreements that they require potential investors to sign before discussing confidential information. Furthermore, Yan testified that an investor contacted him about the *Marianas Variety* article and that the investor's confidence in IPI was damaged.

A showing of loss of goodwill requires more than just speculation to demonstrate that irreparable harm is likely without a preliminary injunction. *See Qualcomm Inc. v. Compal Elec. Inc.*, 283 F. Supp. 3d 905, 918 (S.D. Cal. 2017) (rejecting conclusory assertions about customer dissatisfaction and loss of goodwill without particularized showing as to how goodwill is likely to be irrevocably lost as too speculative to demonstrate irreparable harm); *Goldie's Bookstore*, 739 F.2d at

---

[8] Emmanuel T. Eradiano, *IPI Files TRO to Prevent Release of Financial Information Provided to House, Media*, Marianas Variety, June 25, 2019, http://www.mvariety.com/cnmi/cnmi-news/local/113684.

472 (holding that court's finding, without factual basis, that bookstore "would lose goodwill and 'untold' customers" was speculative); *but see Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1058 (9th Cir. 2009) (loss of customer goodwill that would cause a portion of petitioner's business to evaporate was not speculative); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.") The mere fact that IPIH had to do damage control does not demonstrate irreparable harm. As Yan testified, his responsibilities include addressing the concerns of ongoing and potential investors, contextualizing negative information about the company and correcting misinformation. The only evidence of harm particularized to the release of IPI's financial report was one investor whose confidence was shaken after reading the *Marianas Variety* article. Yan did not testify that this investor backed out of an investment or advised others not to invest based on this information. This is not to say that the Court is adopting CCC's argument that any harm from this information is reparable because it is Yan's job to reassure concerned investors. Nor does the Court suggest that a lost investment demonstrates irreparable harm. Generally, monetary losses can be recovered through an award of damages, and a preliminary injunction is not warranted unless the losses are so great that they will put the party out of business. *See L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). Little more than speculation as to the damage to investor's confidence from disclosure is insufficient to support a finding that irreparable harm is likely.

The confidential nature of the information is at the heart of this request for a preliminary injunction. IPI argues that if this information is released, it cannot be recaptured and made confidential

again – the cat will be out of the bag. CCC argues that the cat was already let out by IPI's parent

company, IPIH, when it filed its annual financial report with the Hong Kong Stock Exchange, which

disclosed tax information about its casino operations in the CNMI and information about its

subsidiaries. (Opp'n at 20–23, ECF No. 1-1 at 451–53.) While some portions of the IPIH report touch

on the information IPI seeks to protect, the scope and format of the IPIH report is not the same as IPI's

financial statements. For example, Plaintiff-Intervenor Grand Marianas is not mentioned in the IPIH

report at all but does appear in IPI's financial statements.

　　　　Some courts have recognized that "the disclosure of confidential information can constitute an

irreparable harm because such information, once disclosed, loses its confidential nature." *Hospitality

Staffing Solutions, LLC v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) (holding that ex-employee's

sharing of proprietary business information including client lists, pricing and billing rates with

competitors demonstrated likelihood of irreparable harm); *see also Corp. Techs., Inc. v. Harnett*, 943

F. Supp. 2d 233, 243 (D. Mass.), *aff'd*, 731 F.3d 6 (1st Cir. 2013) (holding that inevitable disclosure

of confidential information about price quotes, client needs, lists of potential clients by an ex-employee

working for a competitor constituted irreparable harm); *Council on Am.-Islamic Relations v. Gaubatz*,

667 F. Supp. 2d 67, 76–77 (D.D.C. 2009) (disclosure of "materials that contain attorney-client

privileged information, proprietary donor information, and confidential employee personal

information" by an ex-intern who stole more than 12,000 documents from a non-profit organization

constituted irreparable harm for a TRO); *but see ASI Bus. Solutions, Inc. v. Otsuka Am. Pharm., Inc.*,

233 F. Supp. 3d 432, 440 (E.D. Pa. 2017) (no showing of irreparable harm where plaintiff did not

explain how its confidential information was so special or peculiar as to merit injunctive relief).

None of these cases, however, creates a per se rule that disclosure of confidential information is irreparable harm, nor are they binding on this Court. While the confidential nature of information is a factor the court can consider, it is not the end of the analysis. *See Saini v. Int'l Game Tech.*, 434 F. Supp. 2d 913, 919 (D. Nev. 2006) (finding that "[p]ublic disclosure of a trade secret destroys the information's status as a trade secret" but also considering particularized harm caused by disclosure – lost property interest, lost competitive advantage – before holding that the irreparable harm factor was satisfied). Here, the Court acknowledges that, outside of certain regulated industries, audited financial statements are confidential documents, but finds that neither IPI nor Plaintiff-Intervenors have established particularized, non-speculative harm likely to arise from its disclosure that is sufficient to demonstrate that irreparable harm is likely without a preliminary injunction.

       d.   <u>Balance of Equities</u>

The plaintiff must establish that the balance of equities tips in its favor. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). To grant a preliminary injunction, the court has a duty "to balance the interests of all parties and weigh the damage to each, mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *L.A. Coliseum*, 634 F.2d at 1203.

IPI and Plaintiff-Intervenors' asserted harm is fundraising and investor-relations difficulties. CCC argues that it is harmed by being enjoined from complying with the law until this lawsuit is resolved. (Opp'n at 22, ECF No. 1-1 at 453.) CCC concedes that it is unlikely that its director or any CCC employee would be prosecuted for not releasing the information under court order. The Court finds that the balance of equities does not weigh heavily on either side. However, the burden is on IPI

and Plaintiff-Intervenors to prove that the scales tip in their favor. The only interest they have asserted is vague and speculative and not enough to tip the balance of equities in their favor.

e. Public Interest

There are two important public interest concerns at play in this case: governmental transparency and governmental respect for privacy rights. The public interest in transparency is served by allowing CCC to release the unredacted financial statements. The risk of undermining public confidence in privacy rights is diminished by the fact that IPI is in a unique position; as the exclusive casino licensee, it is subject to regulations that govern no individual or other business in the CNMI. IPI's subsidiaries may have concerns about their corporate structure and how their parent company incorporates their information in its public filings with CCC. But those concerns are for their parent company IPI to address. Therefore, the public interest weighs in favor of denying the preliminary injunction.

f. Conclusion

IPI and Plaintiff-Intervenors have not carried their burden for a preliminary injunction. They have not shown that irreparable harm is likely without an injunction, that the balance of equities tips in their favor, or that an injunction is in the public interest. Plaintiff-Intervenors have demonstrated that there are serious questions going to the merits. However, without "a hardship balance that tips sharply toward the plaintiff," *Alliance for the Wild Rockies,* 632 F.3d at 1132, a preliminary injunction for their benefit is not warranted. IPI has not made even a threshold showing that serious questions exist, let alone that they are likely to succeed on the merits. For these reasons, the petition for a preliminary injunction is DENIED.

24

### IV.    Supplemental Briefing

The Court *sua sponte* asked the parties to brief the questions of *Pullman* abstention and supplemental jurisdiction because this case involves Commonwealth law claims concerning the regulation of gambling. IPI and Plaintiff-Intervenors did not move for remand under 28 U.S.C. § 1447(c) prior to the hearings on the preliminary injunction in this Court. However, both parties subsequently filed motions for remand on August 5, 2019, in which they raised abstention and supplemental jurisdiction issues. (ECF Nos. 34, 35, 36.) Because these issues will be further briefed and argued, the Court declines to address them at this time.

IT IS SO ORDERED this 6th day of August, 2019.

RAMONA V. MANGLONA
Chief Judge